## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY LAGROTTERIA, as | : | |
| Administrator Pendente Lite of the Estate of | : | |
| ANTHONY G. TALOTTA, | : | No. 2:23-cv-01786-PLD |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| ALLEGHENY COUNTY, ALLEGHENY | : | |
| HEALTH NETWORK, WILSON | : | |
| BERNALES, DONALD W. | : | |
| STECHSCHULTE, | : | |
| LOCUMTENENS.COM, LLC, | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

Plaintiff Jeffrey Lagrotteria, as Administrator Pendente Lite of the Estate of Anthony G. Talotta ("Mr. Talotta"), by his counsel, hereby files this Amended Complaint as follows:

### INTRODUCTION

1.      For years Defendant Allegheny Health Network ("AHN") and Defendant Allegheny County ("Allegheny County") created a culture at the Allegheny County Jail ("ACJ") where the very fact that an incarcerated person has a mental illness, intellectual disability, or neurodevelopmental disorder meant that they were punished instead of treated. And for incarcerated persons who simultaneously had either mental illness, intellectual disability, or neurodevelopmental disorder with some other chronic care needs, the culture that AHN and Allegheny County created at the ACJ guaranteed that those individuals were discriminated against, and that their medical needs were not met. The confluence of those unmet medical needs at the ACJ became a proverbial death sentence for incarcerated persons. From at least March 2020 through September 2022, that culture killed at least 17 incarcerated persons.

2.      Mr. Talotta was 57 years old when this culture took his life. He entered the ACJ with at least diagnoses of active skin infections on his right foot, intellectual disability, autism spectrum disorder, anxiety, depression, diabetes, and hypertension. Almost at once he was stripped of his ability to receive adequate medical care at the ACJ because of his autism and intellectual disability. He was immediately placed in mental health housing where he was locked in and prohibited from accessing the ACJ's only medical housing unit where his chronic health care needs could be met. His medical devices were taken from him almost immediately. He did not receive any wound care for his active skin infections. Days later, after AHN and Allegheny allowed those infections to worsen, Mr. Talotta became septic. But instead of treating him for sepsis and saving his life when he was clutching his heart and unable to speak, AHN and Allegheny County sent a disgraced physician, Defendant Wilson Bernales ("Bernales"), to him. Bernales gave him allergy medication and put him back into his cell where he was found hours later in septic shock. He died less than 24 hours later.

3.      The ultimate tragedy to Mr. Talotta's story is that he was the seventeenth preventable death in two and a half years at the ACJ that was caused by AHN and Allegheny County's inadequate medical care and their intentional discrimination against individuals with disabilities. All those deaths happened while Defendant Donald Stechschulte ("Stechschulte") served as the Medical Director. AHN and Allegheny County knew that incarcerated persons with intellectual disorders, neurodevelopmental disorders, and chronic care needs were not receiving adequate treatment. Instead of doing anything about it, AHN reaped the benefits of millions of dollars a year by contract with Allegheny County while severely understaffing the ACJ so that prompt medical care was unable to even be provided.

**JURSIDICTION AND VENUE**

4.      This action is brought under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("RA"). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

**PARTIES**

6.      Mr. Lagrotteria is an adult individual residing in Pennsylvania.

7.      AHN is a Pennsylvania nonprofit corporation with a principal place of business at 120 Fifth Avenue, Suite 2900, Pittsburgh, Pennsylvania 15222. At all relevant times, AHN was acting by and through its duly authorized employees, agents, and/or administrators, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with its policies, practices, and customs. At all relevant times, AHN contracted with Allegheny County to provide medical care and treatment on its behalf to incarcerated people at the ACJ. Under contract, AHN and Allegheny County were mutually responsible for adopting, implementing, and enforcing policies and procedures for medical care for incarcerated people at the ACJ. AHN and Allegheny County also entered a partnership whereby AHN provides Allegheny County with hospital and specialty services to individuals at the ACJ. Through that partnership, pertinent medical information is supposed to be entered into the health records accessible at the ACJ regarding off-site care performed by AHN. Release summaries are also supposed to be prepared in the electronic health records to go with an incarcerated person for off-site care, but that rarely happens.

3

8.      At all relevant times, all physicians, nurses, behavioral health specialists, clinical providers, physician assistants, psychologists, psychiatrists, and other healthcare personnel who observed, cared for and/or treated Mr. Talotta at the ACJ were the agents, ostensible agents, servants, representatives, and/or employees of AHN, and were acting while in and upon the business of AHN and while in the course and scope of their employment. The professional liability claims asserted against AHN are for the professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Mr. Talotta at the ACJ. The professional liability claims being asserted against them include direct claims for corporate negligence. AHN had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

9.      Bernales is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a physician at the ACJ. At all relevant times, Bernales was acting under color of state law through his employment to provide medical care at the ACJ, and in accordance with the policies, customs, and/or practices of AHN. Bernales is sued in his individual capacity.

10.     Stechschulte is an adult individual who, at all relevant times, was employed by AHN to practice as a physician at the ACJ. At all relevant times, Stechschulte served as the Medical Director, was a final policymaker for decisions concerning health services, and supervised and authorized the medical programs and care that were provided at the ACJ. At all relevant times, Stechschulte was acting under color of state law through his employment to provide medical care at the ACJ, and in accordance with the policies, customs, and/or practices of AHN. Stechschulte is sued in his individual and official capacity.

11.     Bernales and Stechschulte are collectively referred to as the "Medical Defendants."

12.     Defendant LocumTenens.com. LLC ("LocumTenens") is a Georgia-registered limited liability company with a principal place of business at 2655 Northwinds Parkway, Alpharetta, Georgia 300009. At all relevant times, LocumTenens was a physician staffing agency who was employed by AHN and Allegheny County to find, recruit, and hire Bernales as a physician at the ACJ. At all relevant times, LocumTenens was acting by and through its duly authorized employees, agents, and/or administrators, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with its policies, practices, and customs. At all relevant times, LocumTenens had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

13.     Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 436 Grant Street, Pittsburgh, Pennsylvania 15219.  Allegheny County runs the ACJ at 950 Second Avenue, Pittsburgh, Pennsylvania 15219.  At all relevant times, Allegheny County was acting by and through its duly authorized employees, agents and/or administrators of the ACJ, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with Allegheny County's policies, practices and customs. Although Allegheny County contracts with AHN for medical services at the ACJ, it also supplies medical personnel to the ACJ like licensed practical nurses, infectious disease directors and coordinators, assistant directors of nursing, health services administrators, directors of nursing, mental health specialists, and registered nurses. Allegheny County also supplies custodial staff to ACJ for safety and security purposes. Allegheny County intentionally puts itself into a position to understand, control, and supervise both medical and custodial needs at the ACJ.

14.     AHN and Allegheny County are collectively referred to as the "Municipal Defendants."

## FACTS

### *Inadequate Medical Care*

15.     Mr. Talotta became incarcerated at the ACJ on September 10, 2022, following an alleged assault of a caretaker at a group home for individuals with autism spectrum disorder.

16.     During the alleged assault Mr. Talotta suffered several fractures to his right foot, and significant blistering and bruising after claims that a metal sink with boiling water fell on it.

17.     Mr. Talotta was a pretrial detainee at all relevant times.

18.     When Mr. Talotta became incarcerated, the Medical Defendants knew that he was intellectually and developmentally disabled, and was diagnosed with at least intellectual disability, autism spectrum disorder, anxiety, depression, diabetes mellitus (type 2), and hypertension.

19.     At all relevant times, the Medical Defendants knew all recorded medical information about Mr. Talotta that is described in more detail below.

20.     At all relevant times, the Medical and Municipal Defendants knew that reasonable modifications to policies, practices, and procedures were necessary to ensure that all medical personnel were able to effectively communicate with and treat Mr. Talotta for any medical needs, including, but not limited to, access to medical and mental health services, grievance procedures, housing placement, and classification proceedings.

21.     During intake at the ACJ, medical personnel became aware of Mr. Talotta's foot injury, as well as his history of psychiatric hospitalizations because of his disabilities.

22.     During intake, medical staff described Mr. Talotta as vulnerable.

23.    Medical staff said during intake that Mr. Talotta had "severe mental retardation, autism, anxiety, and depression … [and] appeared to be vulnerable and very child like [sic]," yet several of these diagnoses were not documented on the medical problems list or medically flagged.

24.    During intake, Mr. Talotta said, "I'm feeling pretty scared."

25.    During intake, medical staff knew that Mr. Talotta's intellectual and developmental disabilities made it nearly impossible for him to independently manage and adjust to prison life at the ACJ.

26.    Medical records describe Mr. Talotta's difficulty in adjusting to the noise and instability of prison life.

27.    At all relevant times, Mr. Talotta was not competent to describe his current or ongoing medical condition and every medical personnel at the ACJ, including the Medical Defendants, understood that he was reliant on their care and ability to ensure his health and safety.

28.    Medical personnel at the ACJ knew that Mr. Talotta was incompetent.

29.    At all relevant times, all medical personnel at the ACJ, including the Medical Defendants, knew that Mr. Talotta lived in a group home setting where his care was dependent on others because of his disabilities and serious medical conditions.

30.    But the Municipal Defendants did not give Mr. Talotta even simple things like adequate electronic medical record keeping while he was incarcerated at the ACJ.

31.    By way of example, Mr. Talotta's wound care documents are entirely blank, his medical administration records are devoid of medication management information, and some of his medical records were changed after his death.

32.    His recorded medical information at the ACJ is inaccurate, inconsistent, and did not follow correctional standards.

33.     By way of further example, during screening, even though Mr. Talotta was known to be suffering from a severe foot injury involving several fractures, torn ligaments, and burns, and he was wearing a tall walking boot, medical records describe him as not having any "impaired mobility from casts, bandages, injury, body deformity."

34.     Other medical records show that Mr. Talotta was suffering from "extreme pain [in his right foot] and [would] not allow [the physician assistant] to palpate his leg," while similar records are devoid of any such information.

35.     At other times, Mr. Talotta's leg was medically recorded as either being warm to touch, oozing, puss-filled, and swollen, or no information was recorded at all.

36.     The medical records have no information about wound treatment.

37.     The medical records have no information about wound progression.

38.     To be sure, as described in more detail throughout, no medical personnel at the ACJ provided Mr. Talotta with wound care while he was at the ACJ.

39.     The medical records also show more than a 40-pound difference in his recorded weight at different times during 10 days of incarceration.

40.     Most of his medical records do not capture his basic vital signs.

41.     As just another example, even though medical staff knew that Mr. Talotta was intellectually and developmentally disabled, and was diagnosed with autism spectrum disorder, anxiety, depression, diabetes mellitus, and hypertension, under his "Chronic Conditions" in which those choices are available to medical staff, none were marked as applicable to him except for diabetes.

42.     But even though diabetes was marked as applying to chronic care, Mr. Talotta never received any diabetic-specific care while at the ACJ.

43.    As Mr. Talotta was suffering from sepsis, as described in more detail below, he was also diagnosed with diabetic ketoacidosis stemming from inadequate diabetic care at the ACJ.

44.    Mr. Talotta was also never flagged as requiring chronic care even though everyone knew that he clearly met such criteria at the ACJ.

45.    Everyone knew that diabetes also placed Mr. Talotta at greater risk of skin infection.

46.    The combination of Mr. Talotta's medical diagnoses put him at greater risk of negative outcomes from matters involving his health care, and especially as it involved treating multiple skin infections relating to his right foot.

47.    On September 11, 2022, Mr. Talotta's right foot injury was noticeably worsening, and he was transported to Allegheny General Hospital ("AGH") for increased swelling and blistering.

48.    At the time of this transport, the Medical and Municipal Defendants had already removed Mr. Talotta's walking boot, forcing him to bear weight on what was ordered to be non-weight bearing injuries.

49.    Neither the Medical nor Municipal Defendants gave Mr. Talotta any non-weight bearing alternative at the ACJ after they took his walking boot from him.

50.    Medical providers at AGH diagnosed Mr. Talotta with more, previously unidentified fractures in his right foot, and his right foot was splinted and again ordered to be non-weight bearing.

51.    AGH also diagnosed Mr. Talotta was a torn ligament in his right foot.

52.    Mr. Talotta was discharged from AGH to the ACJ with crutches and a splint.

53.    Mr. Talotta's crutches were taken from him at once when he returned.

54.    Mr. Talotta was thus forced to walk on his seriously injured right foot that was medically ordered on at least two prior occasions to be non-weight bearing.

55.    No medical accommodation was made to ensure that Mr. Talotta's right foot remained non-weight bearing after his walking boot, crutches, and splint were removed.

56.    Mr. Talotta's walking boot, crutches, and splint were removed because he was intellectually and developmentally disabled and thus being housed on mental health pods at the ACJ where incarcerated people were not allowed such medical devices or resources.

57.    According to practices and policies at the time, the Municipal and Medical Defendants removed assistive devices from incarcerated persons who were intellectually and developmentally disabled simply because of those disabilities.

58.    According to practices and policies at the time, the only unit at the ACJ at which Mr. Talotta could have received adequate medical care for his right foot and all his infections was the Medical Housing Unit ("MHU").

59.    But because Mr. Talotta was intellectually and developmentally disabled, according to practice and policies at the time, the Municipal and Medical Defendants restricted his housing and prohibited him from accessing the MHU.

60.    The Municipal Defendants established criteria for individuals who should be housed on the MHU, such as incarcerated people with the following medical circumstances:

    a.    Assistive and/or ambulatory devices like crutches, walkers, canes, and wheelchairs,

    b.    Frequent wound care needs, and

    c.    Diabetes.

61.    But those with intellectual or developmental disabilities were automatically excluded from participation in care provided by the MHU.

62.     Mr. Talotta's serious medical needs for assistive devices, daily wound care, and diabetes satisfied all the criteria set up by the Municipal Defendants for housing on the MHU.

63.     At all relevant times while Mr. Talotta was incarcerated, the MHU had several unoccupied cells, but Mr. Talotta was prohibited by policy of the Municipal Defendants from accessing those unoccupied cells because of his mental health diagnoses.

64.     The Municipal and Medical Defendants were responsible for ensuring that Mr. Talotta was housed in the MHU where he would be permitted to be on non-weight bearing status with access to appropriate medical devices and receive daily wound treatment and monitoring with access to supplies and sterile treatment rooms.

65.     The Municipal and Medical Defendants, however, intentionally housed Mr. Talotta in mental health units where he was denied critical medical care and accommodations because of his intellectual disability and neurodevelopmental diagnoses.

66.     On September 12, 2022, the Municipal Defendants received the results of wound cultures proving that Mr. Talotta's right foot was infected with at least active three different bacterial infections.

67.     At all relevant times, it was known to all medical personnel—including the Municipal and Medical Defendants—that Mr. Talotta's right foot was ordered non-weight bearing and that it was infected with at least three different active bacterial infections.

68.     As an inmate being detained in mental health housing, Mr. Talotta was prohibited from accessing wound care at the ACJ.

69.     Because Mr. Talotta was intellectually and neurodevelopmentally disabled, he had to care for the wounds and infections on his right foot independently, even though everyone at the ACJ knew that he was dependent on their medical care to ensure his own health and safety.

70.     Moreover, at all relevant times, the ACJ was severely understaffed in both custody and medical personnel, and therefore Mr. Talotta was not even allowed to be taken to the MHU at the jail for wound care while he was housed on mental health units.

71.     Around September 13, 2022, it was ordered that Mr. Talotta be administered Sulfamethoxazole (i.e., Bactrim), an oral antibiotic, to treat his known infections, but Mr. Talotta did not receive this antibiotic while incarcerated at the ACJ.

72.     And even if Sulfamethoxazole was provided, everyone knew that at least one of his active bacterial infections was resistant to that antibiotic—meaning, even if provided it would not have resolved at least one of Mr. Talotta's bacterial infections.

73.     On September 14, 2022, Mr. Talotta was transported to West Penn Hospital because of worsening blistering, swelling, and bruising on his right foot.

74.     Mr. Talotta was discharged from West Penn Hospital to the ACJ on the same day with medical orders for daily wound checks and dressing changes.

75.     West Penn Hospital also ordered follow-up wound care in one week.

76.     Despite the MHU being the only unit at the ACJ where Mr. Talotta could have received such care, and despite vacant cells being available, he was again kept on mental health housing units and was never transported to the MHU for care.

77.     There were no policies to ensure that Mr. Talotta received medically indicated and ordered health care for his infected right foot while he was housed in mental health housing at the ACJ.

78.     To the contrary, the policies and practices established by the Municipal and Medical Defendants at the ACJ guaranteed that Mr. Talotta would not receive wound care.

79.     Mr. Talotta did not receive any daily wound checks or dressing changes as ordered while being housed at the ACJ.

80.     There is no documentation that Mr. Talotta received any wound care at the ACJ.

81.     Not only was Mr. Talotta not given wound care, but Bernales overrode West Penn Hospital's order for follow-up care, saying that medical staff can "decide down the road" whether he needs any additional medical care.

82.     Bernales knew that Mr. Talotta was at increased risk for cellulitis because of the trauma and swelling to his right foot, as well as his diabetes and hypertension, but he never ordered even simple things like leg elevation, support stockings, or hygiene, which are critical features of adequate wound care.

83.     Bernales also forced Mr. Talotta to walk on his infected foot, which decreased his chances of recovery and increased his chances of infection growth.

84.     Mr. Talotta was released from West Penn Hospital with orders for Sulfamylon, an antibiotic cream used to treat and prevent skin infections, which he brought back to the ACJ for "self-application," but it was taken from him by Bernales and thus was never provided.

85.     Mr. Talotta was also released from West Penn Hospital with liquid soap, gauze, dressing, and other dressing supplies for wound care that Bernales took from him when he returned.

86.     Even if Mr. Talotta was able to independently address his obvious wound care needs, Bernales removed from him every available resource to do so.

87.     At all relevant times, Stechschulte knew that Bernales removed medical resources from Mr. Talotta to treat his active foot infections.

88.     Mr. Talotta's death at the ACJ was preventable but inevitable because of the inadequate medical care that he received from the Medical and Municipal Defendants during his incarceration.

89.     Mr. Talotta was not provided with chronic care or wound care.

90.     Around 8:00 p.m. on September 20, 2022, Mr. Talotta was found:

    a.     with increased blood pressure,

    b.     with an abnormally increased heart rate,

    c.     with agitation,

    d.     with restlessness,

    e.     with an altered mental state,

    f.     unable to speak, and

    g.     clutching his chest.

91.     Mr. Talotta presented obvious signs and symptoms attributable to sepsis.

92.     Mr. Talotta was obviously septic and/or severely septic.

93.     A medical code was called, and Bernales saw Mr. Talotta on the unit.

94.     Bernales knew that Mr. Talotta was suffering from right foot infections and was showing obvious signs and symptoms attributable to sepsis.

95.     Bernales also knew that Mr. Talotta was not receiving chronic care or wound care and thus the likelihood that his infections were worsening and spreading was the most obvious medical condition for him to treat because of the presenting symptoms.

96.     Instead of treating the medical emergency as sepsis, Bernales gave Mr. Talotta Benadryl for allergies and ordered him back to his cell.

97.     Mr. Talotta could not speak or walk.

98.    Another inmate helped carry Mr. Talotta back to his cell.

99.    Bernales did not order any medical observation for Mr. Talotta.

100.    Bernales did not order any added medications or treatments for Mr. Talotta.

101.    Bernales did not order any further medical examination or evaluation.

102.    At all relevant times, Bernales knew that Mr. Talotta needed urgent medical intervention for sepsis, and that any delays in such intervention exponentially increased his likelihood of morbidity and mortality.

103.    Bernales let Stechschulte know of Mr. Talotta's medical condition, but Stechschulte did nothing to help Mr. Talotta as he slowly died from sepsis.

104.    Around two and a half hours after Mr. Talotta was forced back into his cell while dying from sepsis, he was found unresponsive, foaming from his mouth on the floor of his jail cell.

105.    Mr. Talotta was cold while sweating and breathing heavily.

106.    A second medical code was called.

107.    Emergency Medical Personnel ("EMS") treated Mr. Talotta for sepsis upon arrival.

108.    When EMS arrived, Mr. Talotta was severely septic or in septic shock.

109.    EMS personnel transported Mr. Talotta to UPMC Mercy.

110.    EMS asked Bernales for Mr. Talotta's medical records, but Bernales did not provide EMS with any medical records or a wound care history for Mr. Talotta.

111.    The next day on September 21, 2022, Bernales altered his electronic medical record to reflect in his differential that Mr. Talotta was septic from a right foot wound infection on September 20, 2022, but that he ruled it out as a potential source of his symptoms.

112.    When Mr. Talotta arrived at UPMC Mercy on September 21, 2022, he was treated with a medical regimen for sepsis, severe sepsis, and/or septic shock, but it was too late.

113.    Cellulitis was readily visible on the right foot extending to the right mid-calf at the time of Mr. Talotta's death and was readily visible as of at least 8:00 p.m. on September 20, 2022, when Bernales examined him.

114.    For days before his death, cellulitis was readily visible on Mr. Talotta's right foot.

115.    Wound cultures from Mr. Talotta at the time of his death were positive for at least one common infectious organism in skin infections like cellulitis.

116.    Mr. Talotta was pronounced dead at 10:46 p.m. on September 21, 2022.

117.    Medical providers at UPMC recorded septicemia as cause of death.

118.    Septicemia caused Mr. Talotta's death.

119.    If the Municipal or Medical Defendants gave adequate medical care to Mr. Talotta, then he never would have died from sepsis.

120.    As a direct and proximate cause of the Medical and Municipal Defendants' conduct, or lack thereof, Mr. Talotta suffered from untreated skin infections that took his life.

121.    The conscious pain and suffering that Mr. Talotta endured while incarcerated at the ACJ lasted over one week.

### *Failure to Screen Bernales*

122.    At all relevant times, Bernales and Stechschulte were the only two medical doctors employed by AHN at the ACJ.

123.    Before being hired, AHN contracted with LocumTenens to recruit a medical doctor to be subordinate to Stechschulte in the provision of medical care and services to incarcerated people at the ACJ.

124.    Bernales' employment and medical licensure history was never screened.

125.    A cursory screening would have revealed that Bernales' medical license was suspended, revoked, or denied in at least eight different states, including not limited to, Connecticut, Delaware, Louisiana, New Mexico, New York, Oklahoma, Virginia, and Wyoming.

126.    A cursory screening also would have revealed at least the following publicly available historical information about Bernales' medical career:

    a.    In 2017, the Oklahoma State Board of Medical Licensure and Supervision found that:

        i.    He was "unfit to practice medicine,"

        ii.    He "lacked the capacity for honesty, trustworthiness, and moral integrity necessary for a physician," and

        iii.    He "failed to meet his burden of proving that he is able to safely, skillfully and competently practice medicine."

    b.    Following a five (5) year suspension, he was placed on medical probation in Oklahoma and not reinstated,

    c.    In 2019, the Wyoming Board of Medicine found that:

    [Bernales] appears to have poor insight, particularly as he fails to recognize ownership of the misconduct he has been found to have engaged in. His judgment is currently regarded as poor, due to his failure to change his behavior despite repeatedly having been given specific feedback from licensing bodies….

    The assessment team is of the opinion that Dr. Bernales lacks the capacity for honesty, trustworthiness, and moral integrity necessary for a physician …. At best, Dr. Bernales has an inadequately developed ability to define and delineate moral issues. At worst, his behaviors could suggest a 'catch me if you can' mentality of deception and fraud.

    In either case, the assessment team finds no evidence that Dr. Bernales has the insight to suggest that his capacity for moral integrity could be improved.

    d.    In 2019, the Wyoming Board of Medicine found that he is unable "to safely, skillfully, and competently practice medicine,"

    e.    In 2018, he was sanctioned by the Nevada State Board of Medical Examiners,

f.   Following a five (5) year suspension, he was placed on medical probation in Delaware in 2017 and not reinstated,

g.   The Medical Board of Connecticut revoked his medical license in 2017, after finding that he engaged in a "drumroll of falsity and deception" and has been "repeatedly deceiving various state medical and licensing boards,"

h.   Under consent order in 2016, he is prohibited from practicing medicine in New York,

i.   In December 2016, the New Mexico Medical Board revoked his license and prohibited him from practicing medicine in New Mexico,

j.   In 2016, the Pennsylvania Bureau of Professional and Occupational Affairs decided whether the State Board of Medicine should suspend, revoke, or discipline Bernales' medical license after he was fined in New York for submitting fraudulent information on his New York licensing application,

k.   On July 15, 2015, the Virginia Board of Medicine issued a "Denial of application to practice medicine and surgery based on misrepresentations and fraudulent and false information on his license applications; and incompetent to practice with reasonable skill and safety,"

l.   In 2005, he was denied medical license renewal by the Louisiana State board of Medical Examiners, and his license was permanently suspended in 2006, and

m.   He failed board examinations and residency requirements in Georgia in 2002.

127.   Publicly available court documents in Wisconsin prove that Bernales failed the three-step board examination administered by the United States Medical Licensing Examination.

128.   Bernales has a publicly known history of failed board examinations, residency, and internship suspensions, and knowingly falsifying information in submittals to medical licensing boards across the country.

129.   Bernales has a publicly known history of being unable to practice medicine safely, skillfully, and competently.

130.   LocumTenens knew or had reason to know his professional history.

131.    Allegheny County knew or had to reason to know his professional history.

132.    AHN knew or had reason to know his professional history.

133.    Although LocumTenens was hired to recruit and screen Bernales, AHN and Allegheny County each had a non-delegable duty to ensure that Bernales was qualified and adequately screened to provide medical services at the ACJ.

134.    Neither LocumTenens nor the Municipal Defendants adequately screened Bernales before hiring him to provide medical services at the ACJ.

*AHN's History of Deaths and Inadequate Medical Care at the ACJ*

135.    From March 2020 to Mr. Talotta's death on September 21, 2022, there were at least 17 confirmed deaths of incarcerated people at the ACJ who were under the Municipal Defendants' medical care.

136.    There were also unreported deaths of incarcerated people of the ACJ to an extent that is yet to be discovered.

137.    At all relevant times, Stechschulte was employed as the Medical Director of the ACJ, and he supervised all medical services given at the ACJ by either Municipal Defendant.

138.    Stechschulte handled supervising and ensuring the adequacy of medical services for chronic and mental health care at the ACJ on behalf of the Municipal Defendants.

139.    The Municipal and Medical Defendants know that individuals with intellectual and neurodevelopmental disabilities and chronic care needs are the most medically vulnerable individuals among the inmate population at the ACJ.

140.    At all relevant times, Stechschulte knew that Mr. Talotta was suffering from active skin infections on his foot, was chronically ill, and had simultaneous life support needs, yet he

failed to establish a treatment plan, place him into the MHU, or manage or oversee his chronic care and/or wound care.

141.    Stechschulte, together with the Municipal Defendants, was also responsible for conducting mortality reviews of all deaths involving the ACJ.

142.    Neither the Municipal Defendants nor Stechschulte conducted a single mortality review for any death at the ACJ from March 2020 through September 2022.

143.    Most deaths involved individuals with mental health and/or chronic care needs.

144.    During the same timeframe from March 2020 through September 2022, the ACJ was significantly understaffed in both its custodial and medical needs.

145.    These widespread staffing concerns caused significant delays and/or denials in medical care to the inmate population, including Mr. Talotta and each of the prior deaths.

146.    Stechshulte's inadequate supervision resulted in at least the following:

   a.    Solitary confinement for individuals with intellectual disabilities because of their disabilities,

   b.    Solitary confinement for individuals with neurodevelopmental disabilities like autism spectrum disorder because of their disabilities,

   c.    Immediate loss of privileges and rights to medical for individuals with intellectual and neurodevelopmental disabilities because of their disabilities,

   d.    Over seventeen deaths from March 2020 to September 2020,

   e.    Several amputations from untreated infections in individuals causing osteomyelitis, cellulitis, and sepsis,

   f.    Failure to properly or timely administer medication to individuals with chronic or urgent medical needs,

   g.    Absence of consistent or documented chronic care medical information, and

   h.    Absence of consistent or documented wound care medical information.

147.    In at least the weeks before Mr. Talotta's death, the ACJ's Oversight Board (the "Oversight Board") conducted a survey through the University of Pittsburgh School of Social Work, consisting of questions to incarcerated people who were incarcerated at the ACJ for at least 15 days or more to figure out the satisfaction levels of medical services among the inmate population.

148.    The Oversight Board exists under Pennsylvania law and oversees the ACJ.

149.    The Oversight Board is an independent entity responsible for ensuring the safety, health, welfare, and lawful treatment of incarcerated people at the ACJ.

150.    Stechschulte was the Medical Director for this survey.

151.    The survey was unbiased and supplied no benefit to the incarcerated people except to statistically analyze the adequacy of the medical services being provided at the ACJ.

152.    According to the survey, about 66 percent of the 1,418 individuals who responded said they were "very unhappy" or "somewhat unhappy" with the ACJ's medical services, citing extensive delays in emergency and routine care, medication administration, and chronic care.

153.    Another survey conducted for the same purpose found that about 60 percent of responding individuals received delayed medical care at the ACJ.

154.    The National Commission on Correctional Health Care ("NCCHC") publishes and accredits correctional institutions nationally on matters involving correctional health care.

155.    The NCCHC sets minimum requirements for correctional health care.

156.    The ACJ claims to follow NCCHC standards in correctional health care.

157.    In 2022, the NCCHC found that the ACJ did not meet the following *essential* standards in its correctional health care programs in the following ways:

a. The ACJ failed to conduct adequate administrative meetings and reports to ensure communication among all facility staff members to ensure consistency and to facilitate health care delivery,

b. The ACJ failed to ensure that its custodial policies and procedures are not in conflict with those of health care,

c. The ACJ failed to conduct continuous quality improvement programs to ensure expectations under NCCHC standards are met,

d. The ACJ failed to monitor patients' active medication lists and manage medications when needed,

e. The ACJ failed to meet the requirements for emergency services and response plan involving medical staff's response to incidents within the facility,

f. The ACJ failed to adequately communicate among hospitals, transferring staff, and the jail in that incarcerated people were returning to the jail without prior notification and inadequate anticipation of patient needs,

g. The ACJ failed to adequately screen incarcerated people during receipt/intake, and this failure was contributing to individuals being kept in intake for amounts of time that exceed most jail practices, thus placing incarcerated people at risk for not being treated or identified as requiring additional care,

h. The ACJ failed to adequately provide mental health screening and evaluations,

i. The ACJ failed to implement policies to ensure that mental health requests were addressed in a timely manner, and

j. The ACJ failed to ensure that patients with chronic disease and other special needs were managed using evidence-based clinical treatment practices.

158. In 2022, the NCCHC found that the ACJ did not meet the following *important* standards in its correctional health care programs in the following ways:

a. The ACJ failed to conduct mortality reviews or psychological autopsies,

b. The ACJ failed to report corrective actions related to inmate deaths to its continuous quality improvement program,

     c.     The ACJ failed to implement and monitor systemic issues related to the identification of staff-related issues,

     d.     The ACJ failed to review adverse clinical events or near-miss clinical incidents as part of the continuous quality improvement program, and

     e.     The ACJ failed to establish basic orientation standards or requirements for health care staff.

159.    In 2022, the NCCHC told the Municipal Defendants that it was a priority to "implement a criterion-based chronic care housing unit for those individuals who are more medically fragile and staff it with a registered nurse" because adequate chronic care was not being provided at the ACJ.

160.    The NCCHC's findings and recommendations covered the period during which Stechschulte was the Medical Director of the ACJ.

161.    Indeed, from March 2020 to September 2022, 88 percent of the deaths at the ACJ involved individuals who were either identified as requiring chronic care or who should have been identified as such.

162.    Because the Municipal Defendants communicated so inadequately over patient health and safety, the NCCHC also told them to "institute collaborative briefings after weekends and prior to the following weekend to identify patients on the radar as being at risk or difficult."

163.    The NNCHC told the Municipal Defendants to "ensure that [Medical Director] is receiving a report from the hospital on all inmates upon discharge … [and] [r]equire the MD to document the discharge disposition in the health record and notify the [Direct or Nursing]."

164.    The NCCHC also told the Municipal Defendants to change the operational procedure at processing so that more thorough assessments of newly incarcerated people were conducted.

165.    Consistent with their failures over the medical care being provided to chronically, intellectually, neurodevelopmentally, and mentally disabled individuals at the ACJ, the Municipal Defendants failed Mr. Talotta in at least the following ways:

a.    Failing to screen and identify him as requiring ongoing multi-disciplinary care consistent with evidence-based standards established for the care and treatment of chronic diseases, other significant health conditions, and disabilities,

b.    Failing to identify and utilize established guidelines for treating his chronic illnesses aimed at decreasing the frequency and severity of symptoms, including disease progression and improving health care outcomes,

c.    Failing to create an individualized treatment plan,

d.    Failing to monitor his condition and status,

e.    Failing to take appropriate action to improve his outcome,

f.    Failing to clinically justify any deviations from his treatment,

g.    Failing to consult and prepare adequate housing assignments and program assignments,

h.    Failing to maintain his chronic care needs by classification,

i.    Failing to flag his need for chronic care,

j.    Failing to document his health records,

k.    Failing to monitor medication adherence,

l.    Failing to monitor blood sugars,

m.    Failing to assess risk factors associated with diabetes,

n.    Failing to monitor hypertension,

o.    Failing to monitor hyperlipidemia,

p.    Failing to monitor wound care, and

q.    Failing to monitor mental health.

166.    At all relevant times, the Municipal Defendants failed to establish prison classification and placement procedures that would place incarcerated persons with intellectual and developmental disabilities like Mr. Talotta in positions with the same offerings of programs and opportunities as incarcerated persons without those disabilities.

167.    At all relevant times, the Municipal Defendants implemented policies and procedures that discriminately took rights from incarcerated persons with intellectual and developmental disabilities like Mr. Talotta instead of accommodating them.

168.    Consistent with their failures over the medical care being provided to individuals needing wound care at the ACJ, the Municipal Defendants failed Mr. Talotta in at least the following ways:

        a.      Not deterring wound contamination,

        b.      Not cleaning his wound,

        c.      Not preventing infection,

        d.      Not controlling swelling and pain,

        e.      Not observing wound for progress of healing,

        f.      Not inspecting wound if dressing changes occurred, and

        g.      Not identifying and assessing wound risk factors like immobility, nutrition, chronic medical conditions, and other factors.

169.    The Municipal and Medical Defendants knew that the lack of adequate preventative care, grossly inadequate staffing, and failure to satisfy most of the NCCHC's healthcare standards created an environment where medical emergencies were likely to occur.

170.    From March 2020 through September 2022, the ACJ had a *confirmed* death rate that was three times the national average.

171.    But instead of reviewing the cause of those deaths, policymaking officials for Allegheny County publicly misrepresented the death rate at the ACJ.

172.    After those misrepresentations were made known to the public, Allegheny County had to apologize for lying and admitted to its exceedingly high death rate in comparison even to larger jails and prisons across the Country.

173.    Because of the inadequacies in the foregoing medical programs and services, by the time of most medical emergencies at the ACJ, which were the direct and proximate result of those inadequacies, the likelihood for a successful patient outcome was dramatically decreased if not non-existent.

174.    Less than 12 hours after Mr. Talotta's death, the Municipal Defendants provided its first legitimate training to custodial and medical personnel on dealing with incarcerated persons with autism spectrum disorder like Mr. Talotta.

## COUNT I

**Failure to Train or Supervise
or, in the Alternative, Failure to Adopt Policy,
Under 42 U.S.C. § 1983**

**(As to Municipal Defendants)**

175.    All paragraphs herein are incorporated by reference.

176.    The Municipal Defendants inflicted unnecessary and wanton pain upon Mr. Talotta by not adopting a policy or procedure to address the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders (like autism spectrum disorder) under their care and custody.

177.    The absence of any policy in this regard caused Mr. Talotta—who had to rely upon jail authorities to treat his medical needs—to suffer from actual physical torture that culminated in his slow, painful and lingering death.

26

178.    The absence of any policy in this regard caused Mr. Talotta to needlessly suffer from active infections and cellulitis from burns on his leg, which were easily treatable through proper antibiotics, wound care, and limb elevation, until he developed sepsis which became irreversible and fatal.

179.    The absence of any policy in this regard caused there to be no mechanism through which medical staff and/or jail officials had guidance on how, when, and why to treat incarcerated persons' complaints for emergency and/or immediate medical care.

180.    The absence of any policy in this regard caused a needless denial and delay of access to appropriate (or any) medical care, such as proper clinical responses, assessments, examinations, and diagnostic testing to incarcerated persons with serious medical needs.

181.    The absence of any policy in this regard shows deliberate indifference to a pretrial detainee's serious illnesses who is under the care and custody of the ACJ (like Mr. Talotta) and was the moving force behind Mr. Talotta's death.

182.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Mr. Talotta by failing to train the Medical Defendants on at least the following:

    a.    assessing the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders, under their care and custody,

    b.    treating the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders, under their care and custody,

    c.    ensuring the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders, under their care and custody,

    d.    communicating among medical and correctional staff on the care, assessment and evaluation of incarcerated persons under their care and custody,

e.   reporting medical concerns of incarcerated persons through the chain of command,

f.   tracking incarcerated persons' responses to prescribed medical regimens, and/or

g.   providing proper oversight of medical regimens.

183.   In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Mr. Talotta by failing to supervise the Medical Defendants and/or their employees, agents, and/or administrators in at least the following ways:

a.   by understaffing the medical staff at the ACJ,

b.   by failing to implement and/or enforce policies whereby the medical staff responds to medical requests,

c.   by failing to ensure appropriate diagnostic testing when necessary or applicable,

d.   by failing to ensure that diagnostic testing is carried out when ordered,

e.   by failing to ensure that prescribed medical requests and regimens were implemented,

f.   by failing to ensure the diagnosis, monitoring, and treatment of incarcerated persons with infected wounds or serious burns,

g.   by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with psychiatric disabilities,

h.   by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with neurodevelopmental disorders, including but not limited to autism spectrum disorder,

i.   by failing to ensure that correctional policies and procedures do not conflict, restrict, and/or deny healthcare of incarcerated persons,

j.   by failing to ensure that punitive measures were not used in response to requests for medical or mental healthcare,

k.   by failing to ensure that medical or mental healthcare staff were able to interrupt the use of punitive measures where appropriate,

l.    by failing to conduct adequate mortality reviews to assess whether compliance indicators were being met or inconsistent in how they are being delivered, documented, or communicated,

m.    by failing assess adverse clinical events or near-miss clinical incidents and inform correctional and medical staff of incidents that occurred because of errors attributed to medical management or near-miss events which were preventable,

n.    by failing to assess correctional and medical staff's response to emergency or man-down drills to identify and critique gaps before actual incidents occurred,

o.    by failing to ensure adequate communication among hospital and correctional and medical staff to ensure adequate notification and understanding of the severity of incarcerated persons' medical condition and needs and timely procurement and preparation of resources; and/or

p.    by failing to ensure patients with chronic health conditions were managed using evidence-based clinical treatment practices and that consistent treatment and follow-ups were provided.

184.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Mr. Talotta by failing to adequately screen during the hiring process medical staff including AHN contractors for the proper credentials and qualifications, suspensions, or disciplinary action by a state medical board.

185.    The Municipal Defendants know that their medical and correctional staff will confront situations in which incarcerated persons (like Mr. Talotta) have serious medical needs that could involve a difficult choice, the wrong choice of which would likely cause a constitutional violation.

186.    As stated above, Mr. Talotta's death could have been avoided had the Municipal Defendants adequately trained or supervised their medical and correctional staff on providing appropriate medical care.

## COUNT II

### Inadequate Screening
### Under 42 U.S.C. § 1983

#### (As to Municipal Defendants and LocumTenens)

187.   All paragraphs herein are incorporated by reference.

188.   The Municipal Defendants and LocumTenens failed to adequately screen Bernales when he was hired to provide medical services to incarcerated people at the ACJ in that they failed to adequately check his background to ensure his competency to provide appropriate medical services to incarcerated people at the ACJ.

189.   The Municipal Defendants and LocumTenens failure to adequately screen Bernales caused Mr. Talotta's death because adequate scrutiny would have led any reasonable policymaker to conclude that it was obvious that hiring Bernales would lead to the inadequate provision of medical services to incarcerated people at the ACJ, in violation of the Eight and Fourteenth Amendments to the United States Constitution.

## COUNT III

### Denial and/or Delay of Access to Adequate Medical Care
### under 42 U.S.C. § 1983

#### (As to Bernales)

190.   All paragraphs herein are incorporated by reference.

191.   Mr. Talotta had serious medical needs arising from active infections on his right foot, which were worsened by his chronic and mental health care needs that rendered him unable to independently manage his own healthcare.

192.   Bernales knew of an excessive risk to Mr. Talotta based on the medical information that he learned through Mr. Talotta's incarceration, and through information he learned because of his own evaluations of Mr. Talotta's serious medical needs.

30

193.    Bernales knew that Mr. Talotta's chronic and mental health needs, coupled with active skin infections on his fractured and burned right foot, placed him in a high-risk category for serious medical needs and that this risk was obvious to someone like himself.

194.    Bernales's denial and/or delay of medical care to Mr. Talotta's serious medical needs created a risk of death and did cause Mr. Talotta to become deceased.

195.    Bernales was deliberately indifferent to Mr. Talotta's serious medical needs by failing to timely and adequately provide him with medical care.

196.    Bernales was also deliberately indifferent by not only participating in violating Mr. Talotta's rights, but also by having knowledge of and acquiescing in his subordinates' violations of those rights.

197.    Bernales' deliberate indifference caused serious injuries to Mr. Talotta including death.

198.    Mr. Talotta suffered conscious pain and suffering and death because of Bernales's conduct, which was wanton and willful.

## COUNT IV

### Supervisory Liability
### Under 42 U.S.C. § 1983

### (As to Stechschulte)

199.    All paragraphs herein are incorporated by reference.

200.    At all relevant times, and as described in greater detail above, Stechschulte directed his subordinates and/or acquiesced in his subordinates' conduct that he knew was violative of Mr. Talotta's federal rights.

**COUNT V**

**Disability Discrimination
under the ADA**

**[or in the Alternative, Failure to Accommodate]**

**(As to Allegheny County)**

201.    All paragraphs herein are incorporated by reference.

202.    Mr. Talotta, a qualified individual with documented disabilities described *supra*, was excluded by Allegheny County from the benefits of medical programs and care at the ACJ by reason of his disability and was otherwise subjected to discrimination by Allegheny County by reason of his disability, in violation of the ADA.

203.    Moreover, Allegheny County failed and/or refused to make reasonable modifications in their policies, practices, or procedures to accommodate Mr. Talotta's disability-related needs involving medical care at the ACJ, in violation of the ADA.

204.    Because of Allegheny County's conduct in not providing Mr. Talotta with proper medical care and/or the benefits and services of the medical programs or care at the ACJ, and in failing to make reasonable modifications to accommodate him, he has suffered actual physical injury, including death.

**COUNT VI**

**Disability Discrimination
Under Section 504 of the RA**

**[or in the Alternative, Failure to Accommodate]**

**(As to Allegheny County)**

205.    All paragraphs herein are incorporated by reference.

206.    The ACJ receives federal financial assistance.

207.    For all the reasons found in Count V *supra*, and as described in greater detail above, Allegheny County's conduct toward Mr. Talotta violated the RA.

<div align="center">

**COUNT VII**

**Negligent Hiring and/or Supervision**

**(As to LocumTenens and AHN)**

</div>

208.    All paragraphs herein are incorporated by reference.

209.    LocumTenens and AHN had a duty to exercise reasonable care in hiring and/or supervising competent employees to provide medical care to incarcerated people at the ACJ.

210.    LocumTenens and AHN knew or should have known that Bernales was not competent to provide medical care to incarcerated people at the ACJ, and therefore breached its duty in either hiring him to provide medical care to incarcerated people at the ACJ or in failing to supervise him in providing medical care to incarcerated people at the ACJ.

211.    As a direct and proximate result of LocumTenens and AHN's conduct, Mr. Talotta suffered actual physical injury, including death.

<div align="center">

**COUNT VIII**

**Corporate Medical Negligence (Wrongful Death)**

**(As to AHN)**

</div>

212.    All paragraphs herein are incorporated by reference.

213.    At all relevant times, AHN owed the following non-delegable duties to Mr. Talotta:

a.    The duty to use reasonable care in the maintenance of safe and adequate facilities and equipment,

b.    The duty to select and retain only competent physicians and nurses,

c.    The duty to oversee all persons who practice medicine and nursing within its walls as to patient care, and

<div style="margin-left:2em">

d.    The duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients.

</div>

214.    Mr. Talotta relied upon AHN to uphold these duties.

215.    AHN violated these duties in at least the following ways:

<div style="margin-left:2em">

a.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to identify chronically and mentally ill incarcerated people with medical needs (like wound care),

b.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to implement or identify adequate precautions for chronically and mentally ill incarcerated people with medical needs (like wound care),

c.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for prompt and consistent evaluation of medical needs (like wound care) for chronically and mentally ill incarcerated people, when identified and/or indicated,

d.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for medical needs (like wound care) for chronically and mentally ill incarcerated people,

e.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for individualized treatment plans addressing both risk-enhancing and protective factors,

f.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for chronic care and mental health patient follow-ups,

g.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for establishing treatment plans for medical needs (like wound care) for chronically and mentally ill incarcerated people,

h.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to

</div>

oversee all medical personnel for intake, screening, identifying, and supervision of acute and nonacute chronically ill incarcerated people with mental health concerns,

i.     Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for monitoring medical needs (like wound care) for chronically and mentally ill incarcerated people,

j.     Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for monitoring housing for chronically and mentally ill incarcerated people,

k.     Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for identifying risk factors for medical needs (like wound care) for chronically and mentally ill incarcerated people,

l.     Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for individualized treatment interventions for medical needs (like wound care) for chronically and mentally ill incarcerated people,

m.     Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel so that reliance on individual health and safety is not based solely on the independence of incarcerated people with chronic care needs and neurodevelopmental challenges, and

n.     Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for systematic assessment of medical needs (like wound care) for chronically and mentally ill incarcerated people.

216.  AHN also violated these duties by, among other things:

a.     Failing to identify medical needs (like wound care) for chronically and mentally ill incarcerated people, or those with neurodevelopmental disorders,

b.     Failing to identify signs and symptoms of infections,

c.     Failing to identify sepsis,

d.    Failing to implement appropriate wound care procedures,

e.    Failing to communicate between correctional and health care personnel on wound care procedures,

f.    Failing to provide timely respond to urgent medical needs,

g.    Failing to appropriately respond to urgent medical needs,

h.    Failing to implement individualized treatment plans,

i.    Failing to identify risk-enhancing and protective factors,

j.    Failing to provide comprehensive psychiatric evaluations, and

k.    Failing to follow-up and/or monitor wound care.

217.    AHN further violated these duties by, among other things:

a.    Significantly understaffing providers and non-providers,

b.    intentionally understaffing mental health professionals when a significant portion of the inmate population suffered from mental illness,

c.    intentionally understaffing mental health professionals when a significant portion of the inmate population simultaneously suffered from mental illness and chronic care needs,

d.    failing to implement and/or enforce policies concerning treatment plans for incarcerated people with mental illness and chronic care needs,

e.    failing to ensure adequate follow-ups and treatment plans for incarcerated people with mental illness and chronic care needs,

f.    failing to ensure adequate psychiatric evaluations over suicidality, and

g.    failing to ensure appropriate housing for incarcerated people with mental illness and chronic care needs.

218.    AHN's negligence increased the risk of harm to Mr. Talotta.

219.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Mr. Talotta's rights.

**COUNT IX**

**Vicarious Liability (Wrongful Death)**

**(As to AHN)**

220.    All paragraphs herein are incorporated by reference.

221.    AHN is vicariously liable for the acts, commissions, or omissions of Bernales and Stechschulte, and others who acted and/or failed to act as though AHN performed the acts or failed to perform the acts itself.

222.    AHN is responsible for at least the following negligent acts or omissions of its medical staff, who are their respective agents, ostensible agents, servants, and/or employees, which deviated from the medical standard of care owed to Mr. Talotta in some or all the following ways:

a.    Failing to assess infection risks and wound care,

b.    Failing to manage infection risks and wound care,

c.    Failing to identify risk factors relating to infections and wound care,

d.    Failing to identify overall individualized treatment plans for infections and wound care,

e.    Failing to implement adequate individualized treatment plans for infections and wound care,

f.    Failing to implement individualized treatment interventions,

g.    Failing to screen for risks associated with the chronically and mentally ill as it relates to infections and wound care,

h.    Failing to perform evaluations at clinically relevant or critical times,

i.    Failing to perform comprehensive evaluations on wound care,

j.    Failing to consider both risk-enhancing and protective factors,

k.    Failing to document decisions and/or reasons for choosing or not choosing any particular type of intervention, treatment, and/or assessment,

l.    Failing to explore overall needs in managing infections and wound care,

m.      Failing to assess the degree of infections and wound care.

223.    Bernales and Stechschulte's negligence, as well as the negligence of other medical staff employed by AHN, increased the risk of harm to Mr. Talotta and was a cause in fact to the injuries he suffered and his resultant death.

224.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Mr. Talotta's rights.

## COUNT X

### Medical Negligence (Wrongful Death)

### (As to Bernales)

225.    All paragraphs herein are incorporated by reference.

226.    Bernales was immediately and directly responsible for providing medical treatment and services for Mr. Talotta and to provide those services to Mr. Talotta at the ACJ.

227.    At all relevant times, Bernales had a duty to provide Mr. Talotta with reasonable medical care for his diabetes, hypertension, infections, wounds, and other medical conditions.

228.    In providing medical treatment and services to Mr. Talotta, it was the duty of Bernales to provide care consistent with the standards of reasonably competent physicians.

229.    Notwithstanding these duties, Bernales committed one or more of the following negligent acts or omissions:

      a.      Failing to provide an adequate medical care plan for Mr. Talotta, including adequate wound care treatment in line with mental health and chronic care needs,

      b.      Failing to adequately supervise and observe his medical staff,

      c.      Failing to provide timely and thorough medical examinations of Mr. Talotta,

      d.      Failing to provide timely and adequately respond to requests for treatment,

     e.       Failing to properly document the progression of Mr. Talotta wound care,

     f.        Failure to properly monitor Mr. Talotta's medical status,

     g.      Failure to properly monitor risk factors relating to Mr. Talotta's infections and wound care,

     h.      Failure to properly implement a communication plan concerning his medical care,

     i.        Failure to timely and adequately treat infections relating to Mr. Talotta, and

     j.        Failure to properly monitor Mr. Talotta's legs and feet.

230.    As a direct and proximate result of Bernales's failure to adequately provide medical treatment and care to Mr. Talotta during his incarceration at the ACJ, Mr. Talotta suffered infections leading to his death.

231.    Bernales's actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Mr. Talotta's rights.

## COUNT XI

### Corporate Medical Negligence (Survival)

### (As to AHN)

232.    All paragraphs herein are incorporated by reference.

233.    For all the reasons found in Count VIII above, AHN's negligence increased the risk of harm to Mr. Talotta.

234.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Mr. Talotta's rights.

## COUNT XII

### Vicarious Liability (Survival)

### (As to AHN)

235.    All paragraphs herein are incorporated by reference.

236.    For all the reasons found in Count IX above, Bernales's negligence increased the risk of harm to Mr. Talotta.

237.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Mr. Talotta's rights.

## COUNT XIII

### Medical Negligence (Survival)

### (As to Bernales)

238.    All paragraphs herein are incorporated by reference.

239.    For all the reasons found in Count X above, Bernales's negligence increased the risk of harm to Mr. Talotta.

240.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Mr. Talotta's rights.

### Prayer for Relief

WHEREFORE, Mr. Lagrotteria, as Administrator Pendente Lite of the Estate of Anthony G. Talotta, respectfully requests that judgment be entered in his favor and against Defendants as follows:

(i)    Actual and special damages as to all Counts,

(ii)    Compensatory damages as to all Counts,

(iii)    Punitive damages as to all Counts,

(iv)    Attorney's fees and costs as to Counts I-VI, and

(v)    All other relief as this Court deems just and proper.

Respectfully submitted,

O'BRIEN COLEMAN & WRIGHT, LLC

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

116 Boulevard of the Allies
Pittsburgh, Pennsylvania 15222

(412) 260-1662
alec@ocwjustice.com

and

ABOLITIONIST LAW CENTER

/s/ Jaclyn Kurin
Jaclyn Kurin
D.C. ID No. 1600719
(*pending pro hac vice*)

Bret Grote
Pa. ID No. 317273

Rupalee Rashatwar
Fl. ID No. 1011088
(*pending pro hac vice*)

P.O. Box 8654
Pittsburgh, Pennsylvania 15221

(730) 850-8914
jkurin@alcenter.org
bretgrote@abolitionistlawcenter.org
rupalee@alcenter.org

*Co-counsel for Plaintiff*