IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY LAGROTTERIA, AS ADMINISTRATOR PENDENTE LITE OF THE ESTATE OF ANTHONY G. TALOTTA,<br><br>  Plaintiff,<br><br>  vs.<br><br>ALLEGHENY COUNTY, et al.,<br><br>  Defendants. | 2:23-cv-01786-PLD |

**MEMORANDUM ORDER**

Presently pending before the Court is a dispute among the parties regarding the permissible scope of discovery requested by Plaintiff. For the reasons explained below, the discovery sought by Plaintiff will be permitted in part and denied in part.

I. **Relevant Background**

This lawsuit arises out of the death of Anthony Talotta ("Talotta") while he was an inmate at the Allegheny County Jail ("ACJ"). Among the claims asserted by Plaintiff are *Monell* claims against Allegheny County ("County") and Allegheny Health Network ("AHN").

Talotta was incarcerated in the ACJ for ten days before his death in September 2022. According to the First Amended Complaint, when he was admitted to the jail, he had diagnoses of an infected foot, intellectual disability, autism spectrum disorder, anxiety, depression, diabetes, and hypertension. Among other things, Plaintiff alleges that Defendant Dr. Wilson Bernales failed to provide adequate medical care for the infected wound on Talotta's foot, ultimately resulting in septicemia. An autopsy concluded that he passed away as a result of hypertensive and atherosclerotic cardiovascular disease. After Talotta's death, it was discovered that Dr. Bernales

had a number of documented suspensions or revocations of his medical license in other states. He is no longer practicing at ACJ.

### A. Discovery Sought by Plaintiff

Plaintiff argues that, since 2015, when the County entered into an agreement with AHN to provide healthcare services at ACJ, the municipal defendants and Dr. Donald Stechschulte (Medical Director at ACJ) have been aware of the specific systemic deficiencies which contributed to the death of Talotta and dozens of similarly situated individuals before him.

In October 2019, ACJ was found to be out of compliance with standards of the National Commission on Correctional Health Care ("NCCHC") regarding the treatment of medical emergencies. Also in 2019, the NCCHC strongly recommended that ACJ staff receive training in interacting with people with autism and mental illnesses. The County and AHN contracted with NCCHC to do a Mortality Review Report on 27 deaths at ACJ since 2017. It was completed in December 2022, and a number of deficiencies were noted. A Performance Audit Report by the Office of the Controller on staffing at the Allegheny County Jail for the period January 1, 2021 through September 30, 2022 noted a number of vacant positions.

Based upon his claim that Defendants have been aware of systemic deficiencies since 2015, Plaintiff argues that discovery be expanded back to 2015 as related to his *Monell* claim.[1] Plaintiff notes that the First Amended Complaint alleges plausible *Monell* claims against Defendants based upon their failure to train or supervise, or in the alternative, to adopt appropriate

---

[1] Dr. Homer Veters, an expert retained by Plaintiff, opines that it is plausible that systemic deficiencies in a jail's healthcare services can contribute to injury or death, and therefore takes that position that the production of records for deaths and medical emergencies since 2015 are necessary even if the causes of death are different. Dr. Veters states elsewhere in his report that an analysis of *recent* deaths is important. He does not discuss "near-misses" as referenced by Plaintiff.

2

policies or customs, leading to inadequate screening, treatment, monitoring, emergency services, mortality reviews and other vital healthcare practices. He asserts that these failures have caused the deaths of over 30 incarcerated persons, including Mr. Talotta, at ACJ since 2015, all of whom had psychiatric and/or intellectual disabilities and chronic medical illnesses.

In a proposed order, Plaintiff seeks the following discovery[2]:

- Jail medical and housing records of inmate decedents near misses/deaths from 2015 to the present, and records, documents, information, and communications of their deaths, including investigations, mortality reviews, and related meeting minutes;

- Records of the ACJ's compliance with NCCHC and American Correctional Association (ACA) correctional healthcare standards, and related quality improvement efforts concerning screening, treatment plans, and communications concerning other relevant healthcare services, policies, and staffing inadequacies;

- Statistical reports on the prevalence of populations with psychiatric disabilities, intellectual disabilities, wound care, and other chronic care needs at ACJ;

- Inmate grievances concerning psychiatric disabilities, intellectual disabilities, wound care, and other chronic care needs at ACJ from 2015 to the present;

- Records concerning the supervision of ACJ and AHN medical personnel, including the screening, hiring, on-boarding, training, retention, discipline, and performance evaluation of personnel between 2015 and 2023, including related meeting minutes, and competency, licensing, and credentialing forms; and

---

[2] It is unclear to the Court if the discovery identified in the proposed order is a consolidation of a number of separate requests for production that have been propounded by Plaintiff. At any rate, this opinion will specify the discrete categories of documents that will be ordered to be produced.

3

- Documents of compliance with the AHN Health Services Agreement, including documents concerning healthcare and correctional staffing levels, and AHN's financial condition.

Plaintiff also notes that Defendants did not move to dismiss the *Monell* claims, the substance of which is not limited to identical medical conditions or injuries.

Defendants object in whole or in part to each of these discovery requests. The parties' positions will be outlined below.

B. Summary of the County's Position

The County contends that Plaintiff's requests for discovery, which seek documents spanning nine years, are overbroad in scope, disproportionate and burdensome. It notes that Plaintiff has propounded 216 requests for production, including subparts, and estimates that the search Plaintiff demands would result in the production of over 1 million documents.[3] It asserts that although an autopsy concluded that Talotta passed away from natural causes, not as a result of his autism or intellectual disabilities, Plaintiff seeks medical and housing records related to inmate near misses/deaths for an eight-year period prior to Talotta's death and for a one-year period after his death. The County notes that the NCCHC report lists 27 deaths between 2017 and 2023, but the causes of death were varied, including 7 deaths by suicide. Only seven of the deaths during this period related to coronary disease and none of them were similar to Talotta's conditions. It states that it has already produced redacted copies of three reports by the NCCHC

---

[3] The County notes that in a separate class action, *Howard v. Allegheny County,* 20-cv-1389, which only involved inmates with mental health issues and a time period commencing in 2019, it produced over 850,000 pages of documents. According to the County, many of the 1027 pages in the exhibit that accompany Plaintiff's brief in support of his discovery come from the *Howard* action, and supposedly show that the County was aware of deficiencies and staff shortages at ACJ. *Howard* concluded with the issuance of a consent order in July 2024.

regarding deaths at the ACJ. Further, it argues, supervision records for persons who had any contact with or knowledge of Mr. Talotta are relevant, but not others.

Prior to August 2017, ACJ's medical records were in paper form only (2642 records in 50 boxes) and maintained off-site, and the County argues that it would be burdensome to produce responsive documents because they are not indexed based on the condition being treated. Similarly, grievance records were only on paper until 2017, and there are 3680 currently in the database since 2017 that would have to be searched.

Further, the County asserts that requesting nine years' worth of documents concerning inmates with intellectual disabilities and other medical conditions is overbroad and disproportionate to the needs of this case. And while it agrees to produce existing statistical reports on the prevalence of populations with autism, intellectual disabilities or wound care from September 2021 to December 31, 2022, the County takes issue with any request that would require it to create or develop reports that do not exist.

Based on these objections, the County is willing to produce the following:

1. Unredacted NCCHC reports and any ACA or DOC Reports submitted on or after 2018 related to physical or mental health care at ACJ;

2. Documents demonstrating improvements in health care at ACJ since 2020;

3. Existing statistical reports on the prevalence of populations with autism, intellectual disabilities or wound care;

4. Inmate medical grievances concerning autism, intellectual disabilities and wound care at ACJ from September 2021 to December 31, 2022;

5. Personnel records of medical providers identified by Plaintiff as having provided services to Mr. Talotta; and

      6. Any file or record it maintains dealing with compliance with the AHN Health Services Agreement between January 1, 2020 and December 31, 2022.

    C. <u>Summary of AHN's Position</u>

AHN argues that Plaintiff's requests for expanded discovery should be denied in their entirety. It argues that in *Monell* cases, overly broad discovery requests have been found to impose a significant burden on parties and as such, can be denied or limited. For example, seeking nine years of records for deaths and undefined "near-misses" should be rejected as overbroad because this request is unrelated to any specific constitutional violation. It contends that failure to abide by NCCHC standards is not actionable because it is a private organization whose standards do not set constitutional bounds. Further, Plaintiff's assertion that systemic issues "contributed" to Mr. Talotta's death does not meet the causation standard that is required for *Monell* liability. It also notes that because AHN was not a defendant in the *Howard* case or a party to the consent order, any reference to that case is irrelevant as it relates to AHN.

As requested, AHN ran a search regarding the 37 inmates about whom Plaintiff seeks information. Its search resulted in 124,733 hits, which it asserts reflects the voluminous and burdensome nature of Plaintiff's request. Further, it asserts that none of the inmate deaths identified by Plaintiff as evidence of constitutional violations involve the same injury or manner of death as Talotta's. It also notes that requesting grievances over a nine-year period is disproportionate under Rule 26(b)(1).

According to AHN, the County—not AHN—hires nursing assistants, nurses, medical assistants, mental health specialists and pharmacy technicians, while AHN hires physicians, CRNPs and physician assistants. Plaintiff ignores the fact that AHN employees twice had Mr.

Talotta sent to outside hospitals for treatment prior to the September 20, 2022 event forming the basis of this lawsuit.

Finally, AHN objects to pre-trial discovery of AHN's financial status because it contends that such discovery is prohibited absent a bona fide claim for punitive damages which it claims does not exist in this case.

## II.    Discussion

The First Amended Complaint asserts a *Monell* claim against the County and AHN.  In Count I, Plaintiff alleges that these Defendants failed to adopt "a policy or procedure to address the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders (like autism spectrum disorder) under their care and custody."  This failure allegedly led to a delay in Talotta's medical care, ultimately leading to his death.  Count I alternatively alleges that the County and AHN failed to properly train the Medical Defendants to assess and treat immediate and emergency medical concerns of inmates, including those with conditions presented by Talotta; failed to supervise the Medical Defendants and their employees in multiple respects; and failed to adequately screen medical staff during the hiring process.[4]

As set forth in Federal Rule 26(b)(1), it is necessary to review the discovery sought by Plaintiff in order to determine if it is relevant to Plaintiff's claims and proportional to the needs of this case.  This requires a consideration of such factors as "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the

---

[4] This general summary of Count I is not intended to represent a complete recitation of the detailed allegations of Plaintiff's claim.

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*[5]

Plaintiff contends that Talotta's death was the result of years of "systemic issues" at ACJ caused by the County and its medical provider, AHN. At the heart of his *Monell* claims against them, however, are the alleged unconstitutional policies and practices that existed during Talotta's incarceration at ACJ. While some historical discovery certainly may be relevant to Plaintiff's claims, his request for a vast array of documents dating back nine years before Talotta's confinement at ACJ is not proportional to the needs of this case, nor does its likely benefit outweigh the burden of the proposed discovery. If, as Plaintiff alleges, a culture/policy of punishment and deliberate indifference to Talotta's medical needs existed while he was confined at ACJ, this will be reflected through the documents for which production will be ordered, or are documents that are already in his possession, including those documents provided with Plaintiff's brief.

With these principles in mind, the Court turns to the specific document requests at issue.[6]

A. <u>Jail medical and housing records</u>

Plaintiff first seeks "jail medical and housing records of inmate decedents near misses/deaths from 2015 to the present, and records, documents, information, and communications of their deaths, including investigations, mortality reviews, and related meeting minutes."

As an initial matter, the Court concludes that seeking discovery about "near misses," a term not defined by Plaintiff, is improperly vague and fails to provide sufficient information to inform

---

[5] While Plaintiff notes that his expert opines that the breadth of the discovery must include the six areas sought by Plaintiff, the Court is not bound by Dr. Veters' opinions about appropriate discovery; rather, the Court must analyze the requested discovery under Rule 26 and relevant case law. Giving all due respect to Dr. Veters, he is not qualified to opine on the legal standards that apply to Plaintiff's discovery requests.
[6] As AHN's position is essentially that Plaintiff's requests should be denied in their entirety, the following discussion largely addresses the positions of Plaintiff and the County.

a search for discoverable information. Therefore, Defendants will not be required to produce documents related to "near misses."

With respect to deaths at the ACJ, Defendants argue that Plaintiff's request is overbroad because it is not limited to the specific medical conditions with which Plaintiff presented when first incarcerated at ACJ. However, the policy issues identified by Plaintiff are not based on precisely the same medical conditions as those of Talotta, but rather, on the concept that the death of other inmates resulted from the same unconstitutional policies. *See, e.g., Green v. Meeks*, 2023 WL 1447817, at *8 (S.D. Ill. Feb. 1, 2023)( in evaluating a *Monell* claim, the court held that "Plaintiff must be allowed broad discovery into the treatment of other inmates, including inmates who did not suffer from the exact same medical issues as the plaintiff. The Court will not limit the scope of discovery to information only pertaining to Green's specific medical conditions.").

Nevertheless, Plaintiff's request is overly broad, unduly burdensome and not proportional to the needs of this case. First, as the County explains, only paper records were maintained before 2017, and they are not categorized by medical conditions. Thus, the County would be required to review more than 2642 records in 50 boxes to comply with this request. AHN also notes that Plaintiff's ESI proposal resulted in over 124,000 hits. This volume, it asserts, would result in a costly and time-consuming effort to review, redact and produce the requested documents.[7] As such, Plaintiff's request is unduly burdensome.

Moreover, Plaintiff has been provided with three reports from the NCCHC about 27 deaths at ACJ, including those between 2017 and 2022, with a fourth to be released soon. Presumably, this has provided Plaintiff with some information about these deaths.

---

[7] AHN also advises that the proposed "AHN-wide email search" regarding 37 inmates would be impossible as it is necessary to search by custodian with identified search parameters.

Having reviewed the breadth of Plaintiff's request and Defendants' arguments, the Court declines to direct Defendants to produce the breadth of documents requested. Given NCCHC's report regarding the death of these inmates, obtaining their complete medical records and much of other requested information is excessive and not calculated to lead to the discovery of admissible evidence. However, the County and/or AHN will be required to produce any existing document that identifies the housing location of each of the 27 inmates identified in the NCCHC report on the date of their death, as well as any non-privileged document not already produced that constitutes an investigation of their death. The name and identifying personal information of the inmates, if not identified in the NCCHS reports, may be redacted as Plaintiff does not require this information to support its *Monell* claims.

B. <u>ACJ's compliance with NCCHC and ACA correctional healthcare standards</u>

Plaintiff's next request is for "records of the ACJ's compliance with NCCHC and ACA correctional healthcare standards, and related quality improvement efforts concerning screening, treatment plans, and communications concerning other relevant healthcare services, policies, and staffing inadequacies." As the County notes, however, this extremely broad request generally relates to all correctional healthcare standards. As such, it goes well beyond the alleged policy and practice failures set forth in Count I of the First Amended Complaint.

Moreover, as AHN states, NCCHC "standards represent the recommendations of private organizations in the corrections field that provide accreditation services to correctional facilities. They were not intended to be constitutional mandates, nor could they be since they have not been adopted by any governmental entity. The failure of a correctional facility to comply with these standards means only that it will not be accredited by ACA or NCCHC." *Arocho v. County of Lehigh*, 922 A.2d 1010, 1018 (Pa. Commw. 2007).

The County represents that it will produce unredacted nonprivileged documents that reflect its compliance with healthcare recommendations made by the NCCHC and the ACA since 2020. The Court concludes that this production is sufficient.

C. Statistical reports

Plaintiff also seeks "statistical reports on the prevalence of populations with psychiatric disabilities, intellectual disabilities, wound care, and other chronic care needs at ACJ." The County indicates in its response that it is willing to produce existing statistical reports on the prevalence of populations with autism, intellectual disabilities, or wound care. It objects to being required to create or develop a report that does not exist, but states that to the extent that this data can be produced by querying an existing database, it will be provided.

Based upon the County's willingness to produce these documents, and the Court's view that "other chronic care needs" is improperly vague and "psychiatric disabilities" is overinclusive given the issues in this case, it will grant Plaintiff's request in part in a manner consistent with the County's response.

D. Inmate grievances

In his proposed order, Plaintiff seeks "inmate grievances concerning psychiatric disabilities, intellectual disabilities, wound care, and other chronic care needs at ACJ from 2015 to the present." In his Brief, he asks for the production of grievances about "inadequate medical care and/or medical accommodations" regarding these conditions, as well as the tracking of these grievances, and the responses, outcome or remedial measures for all such grievances, as well as any related communications.

Plaintiff's document requests are not proportional to the needs of this case and unduly burdensome. The County represents that prior to 2017, grievances were not electronically stored.

11

Since then, over 3800 grievances has been submitted by inmates, although these documents are at least searchable. The County also notes that grievances only represent inmate allegations, not necessarily facts, but at any rate, it contends that any grievances produced must relate to an issue in this case. Thus, it is willing to produce grievances related to wound care and coronary disease that were submitted between September 2021 through September 2022 with the inmate's name and personally identifiable information redacted.

As previously discussed, the Court finds that the County's identification of the categories of medical issues is too narrow. At the same time, Plaintiff's request for nine years of grievances and every communication and remedial measure related to such grievances, as well as expanding the production to all psychiatric disabilities and all chronic needs is overly broad and disproportional to the needs of this case. In Count I, Plaintiff claims, among other things, that the County/AHN failed to adopt policies and procedures to address the "immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders (like autism spectrum disorder)…" As a result, Plaintiff asserts, the lack of any such policies or procedures caused a delay in the treatment of Talotta's wounds, leading to his death.

Thus, the grievances that may be relevant to the *Monell* claims are those that assert complaints about the lack of immediate and/or emergency medical care. The existence or lack of existence of such policies as of the time frame of Talotta's incarceration is central to Plaintiff's claim. Further, the production of such grievances may demonstrate notice to the County/AHN of any alleged systemic issues as of the date of Talotta's incarceration, and both Defendants may be deposed about their efforts, if any, to address any such deficiencies. The Court concludes that production of such grievances is appropriately limited to two-year time frame of September 1,

2020 to September 30, 2022. The Court also directs that the names and personally identifying information about these inmates shall be redacted, as this information is not required to support Plaintiff's *Monell* claims.[8]

### E. Records concerning the supervision of ACJ and AHN medical personnel

Plaintiff next ask for the production of "records concerning the supervision of ACJ and AHN medical personnel, including the screening, hiring, on-boarding, training, retention, discipline, and performance evaluation of personnel between 2015 and 2023, including related meeting minutes, and competency, licensing, and credentialing forms." The County argues that the relevant records are limited to those who provided any services to Talotta while at ACJ. It states that it is willing to provide the entire personnel record of all such individuals. That would include records of training, retention, discipline, and performance evaluations of the medical providers who provided service to him.

Plaintiff has alleged that the County and AHN failed to properly train the Medical Defendants to assess and treat immediate and emergency medical concerns of inmates, including those with conditions presented by Talotta; failed to supervise the Medical Defendants and their employees in multiple respects; and failed to adequately screen medical staff during the hiring process. Therefore, even assuming the existence of systemic issues as Plaintiff alleges, Plaintiff seeks information about the policies, or lack thereof, that led to the deficiency of the medical care provided to Talotta by the personnel who provided those services, including the policies, practices and customs that existed about their training, supervision and screening. As such, requiring the

---

[8] The parties shall meet and confer regarding the parameters of an electronic search for grievances that complain about the lack of immediate and/or emergency medical care. In the event that it cannot be accomplished without further guidance from the Court, the parties shall request a conference with the Court to address this issue.

13

production of documents regarding all medical personnel employed at ACJ since 2015 is overly broad and not proportional to the needs of this case. Simply put, the central issue regarding the *Monell* claim as it relates to this document request is whether the County and/or AHN fail to train, supervise and screen those individuals who provided, or should have provided, medical care to Talotta, and their policies, practices or customs as it relates to those individuals. Therefore, the documents that the County has identified are adequate for this purpose.

      F.  <u>Documents regarding compliance with AHN Health Services Agreement</u>

Finally, Plaintiff asks for the production of documents regarding compliance with the AHN Health Services Agreement, including documents concerning healthcare and correctional staffing levels.

The County responds that it does not object to the production of any record it maintains that deals with AHN's compliance with the Agreement related to services it provided at ACJ during the period of time between January 1, 2020 through December 31, 2022. The Court concurs that this represents a reasonable compromise.

Plaintiff also seeks documents regarding AHN's financial condition. AHN objects to providing documents about its financial condition at this stage because Plaintiff has not demonstrated an entitlement to punitive damages.

Because Plaintiff seeks punitive damages in this case, documents regarding AHN's financial condition are discoverable, and the Court declines to delay this discovery until some post-fact discovery window. *See Blank River Servs., Inc. v. TowLine River Serv., Inc.*, 2020 WL 13443864, at *3 (W.D. Pa. Mar. 25, 2020) (district courts within our Circuit have held that "when punitive damages are alleged, the weight of authority requires that a defendant disclose his financial condition in pretrial discovery without requiring a prima facie showing of punitive

damages to justify the discovery."). However, as seeking documents about AHN's "financial condition" is improperly vague and not limited in time or scope, Plaintiff must more specifically identify the documents sought by conferring with AHN. Further, any documents produced must be subject to a confidentiality agreement and used solely for purposes of this litigation. If the parties cannot agree on the specific documents that are subject to production and the terms of a confidentiality agreement, they shall advise the Court as to the nature of the disputed issues and the Court will issue an appropriate order that sets the boundaries of the production and use of these documents.

## **ORDER**

Therefore, this 14th day of January, 2025, it is ORDERED that to the extent that the following documents are in the possession of Allegheny County and/or AHN, they shall produce these documents within thirty days of the date of this Order:

1. Any existing document that identifies the housing location of each of the 27 inmates identified in the NCCHC report on the date of their death, as well as any non-privileged document that constitutes an investigation of their death. The name and personal identifying information of the inmates shall be redacted;

2. Unredacted documents that reflect compliance with healthcare recommendations made by the NCCHC and the ACA since January 1, 2020.

3. Existing statistical reports on the prevalence of populations with autism, intellectual disabilities, and wound care.

4. Unredacted NCCHC reports and any ACA or DOC Reports submitted on or after 2018 related to physical or mental health care at ACJ;

5.  Documents demonstrating improvements in health care at ACJ since January 1, 2020;

6.  Inmate grievances that assert complaints about the lack of immediate and/or emergency medical care that were generated between September 1, 2020 and September 30, 2022. The names and personally identifying information about these inmates shall be redacted;

7.  The personnel records of all medical providers who provided services to Mr. Talotta; and

8.  Any file or record dealing with compliance with the AHN Health Services Agreement between January 1, 2020 through December 31, 2022.

It is further ORDERED that within ten days of the date of this Order, Plaintiff must more specifically identify the documents he seeks about AHN's financial condition and confer about their production with AHN. Assuming the parties reach agreement, responsive documents must be produced within 30 days of the parties' conference and must be produced subject to a confidentiality agreement, including an agreement that they will be used solely for purposes of this litigation.

BY THE COURT:

/s/ Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge